**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES M. FORMAN, CHAPTER 11 TRUSTEE,<br><br>                    Plaintiff,<br><br>vs.<br><br>WACHOVIA INSURANCE SERVICES, INC.,<br><br>                    Defendant. | Civil Action No.: 06-1622 (PGS)<br><br>OPINION |

Charles M. Forman ("Plaintiff") is the bankruptcy trustee for Omne Staffing, Inc. ("Omne Staffing") and its related entities (collectively, "Omne"). In connection with his role as trustee, Plaintiff has filed suit against Wachovia Insurance Services, Inc. ("Defendant" or "Wachovia") for its alleged failure to procure the appropriate workers' compensation insurance for Omne. Specifically, Plaintiff alleges that Omne requested coverage from Wachovia for two businesses, Omne Staffing and Omne Staff Leasing Services, Inc. ("Omne Leasing"). However, due to Wachovia's alleged negligence, Omne only received coverage for Omne Staffing. As a result, Plaintiff alleges, the Omne bankruptcy estate has been directly exposed to claims made by two injured Omne employees for alleged work-related injuries.

Presently before the Court are cross-motions for summary judgment. For the following reasons, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

## I. BACKGROUND

Omne was controlled and founded by Barry Sinins. (*See* Kaller Decl. Ex. S ¶¶ 58-72, 89.) Omne was a "professional employment" company that "contracted with customers to furnish temporary and leased employees and employment related administrative services." (*Id.* ¶ 77.) *See also MV Transp. v. Omne Staff Leasing, Inc.*, 378 F. Supp. 2d 1200, 1202-03 (E.D. Cal. 2005) (Omne provided "a variety of services to clients by hiring their clients' employees as their own and then leasing those employees back to their clients.").

In June 2002, Omne corporate officers Sinins and Richard Galdi sought new workers' compensation insurance for their employees. (Amend. Compl. ¶ 10.) In connection with that effort, Sinins and Galdi, met with Robert W. Cantrell, a broker at Wachovia. (*Id.*) Omne needed workers' compensation insurance because the company's existing policy with Great American Insurance Companies ("Great American") was set to expire at the end of July 2002. *MV Transp.*, 378 F. Supp. 2d at 1203. Great American had refused to renew the Omne's workers' compensation policy due to late reporting of claims. (Kaller Decl. Ex. C (Wood Dep. 61:8-9).)

At the June 2002 meeting, Sinins allegedly "specifically requested" workers' compensation insurance for both Omne Staffing and Omne Leasing. (Lowenthal Decl. Ex. 5 ¶ 9.)[1] *See also MV Trans.*, 378 F. Supp. 2d at 1207-08. This allegation, however, is sharply disputed by Defendant. Cantrell testified at his deposition that Omne Staffing was the only operating entity, and thus, he was

---

[1] Prior to his death, on December 28, 2004, Sinins filed a declaration in *MV Transportation*, which was re-filed in this case as an exhibit to the Lowenthal Declaration. Defendant argues the Sinins Declaration should be struck as inherently unreliable and because it was not subject to cross-examination. (Def's. Br. at 27.) *MV Transportation* is a California case in which Wachovia was similarly sued for negligent procurement of insurance for Omne. The court denied summary judgment based upon contradictory statements made by Cantrell and Sinins regarding the June 2002 meeting. 378 F. Supp. 2d at 1208.

only responsible for procuring coverage for Omne Staffing:

> [T]here was a discussion of the other trade names, all the names that were associated with the offices as trade names used for marketing and local representation, but that all payrolls and all employees w[ere] run through Omne Staffing, Inc., and that all the documentation that was provided corroborated that -- statements by Galdi and Sinins that the payroll was all run through Omne Staffing.

(*Id.* Ex. B (Cantrell Dep. 43:13-21).)[2]

In the days and weeks that followed the June 2002 meeting, Cantrell "collected various source documentation" necessary to procure a workers' compensation policy for Omne Staffing. (Pl's. 56.1 Stmt. ¶ 23.) These documents included the following: (a) past insurance policies; (b) website information; (c) company newsletters; (e) historical loss runs; (f) a prior audit report (g) regulatory files; and (h) financial statements. (*Id.*) Notably, contrary to Cantrell's understanding, some of these documents suggest that Omne was operating under several subsidiaries, not just Omne Staffing. For example, Omne operated as "OMNE STAFFING, INC. ET AL" on its Great American policy. (Lowenthal Decl. Ex. 22 (emphasis in original).) Omne Staffing's May 29, 2002 audited financials for years 1999 through 2001 stated "Omne Staffing, Inc. and Subsidiary." (*Id.* Ex. 23.) Omne advertised on its Web site that it conducted business in Texas as both "Omne Staffing, Inc." and "Omne Staff Leasing Services, Inc." (*Id.* Ex. 21.) And Omne's company newsletter referenced both the "Staffing Group" and the "Leasing Group." (*Id.*)

In addition to gathering source documents, on June 13, 2002, Cantrell completed an industry-standard "Accord Insurance Application" in preparation for soliciting potential insurers. Cantrell's

---

[2] Cantrell's account of the June 2002 meeting is also contradicted by previous deposition testimony he provided in *MV Transportation*. In that case, Cantrell stated that he could not "specifically recall" his conversations about Omne's employee leasing practices and entities. (Lowenthal Decl. Ex. 3 (Cantrel Dep. 73:13).)

application was inaccurate in at least three respects. First, Question 1 in the General Information section asked whether Omne Staffing was a subsidiary of another entity or had any subsidiaries. Cantrell did not answer the question despite Omne's source documentation suggesting operating subsidiaries. (Lowenthal Decl. Ex. 7.) Second, Question 18 inquired about whether any previous coverage had been non-renewed in the last three years. (*Id.* Ex. 25.) Cantrell answered "no," even though the Great American policy had been non-renewed as a result of late-reporting of claims. (Kaller Decl. Ex. C (Wood Dep. 61:8-9).) Finally, Question 21 asked whether Omne leased employees to or from other employers. (Lowenthal Decl. Ex. 25.) Cantrell answered "no," omitting any reference to Omne Leasing. (*Id.*)

On June 28, 2002, Cantrell and Kemper Insurance Company ("Kemper") began negotiations on a workers' compensation policy for Omne. (Amend. Compl. ¶ 12.) In or about mid-July, Kemper agreed to cover Omne Staffing through a Kemper subsidiary, American Protection Insurance Company ("AMPICO"), effective July 31, 2002. (Lowenthal Decl. Ex. 12.) For his efforts, Cantrell's employer, Wachovia, received a substantial commission, which Plaintiff suggests colored Cantrell's judgment. (*See* Pl's. 56.1 Stmt. ¶ 18.) Cantrell did not obtain coverage for Omne Leasing or any other Omne-related entity. (Lowenthal Decl. Ex. 12.) *See also MV Trans.*, 378 F. Supp. 2d at 1203 ("AMPICO asserted that it had issued a policy to Staffing, not Leasing.").

In December 2002 and April 2003, AMPICO conducted a premium audit of Omne. As part of the April 2003 audit, AMPICO requested from Omne a list of all payrolls and customers. (Kaller Decl. Ex. V.) In response to that request, Sinins purportedly indicated to AMPICO that "Omne Staffing was the only company, and he provided all the payroll and revenue for that." (*Id.* Ex. F (Walsh Dep. 16:24-25).) Nonetheless, AMPICO's audit found that 21 out of 27 employees who

made claims were not listed on the payroll records for Omne Staffing produced by Sinins. (*Id.* (14:11-23).) Sinins's representation to AMPICO auditors is consistent with Cantrell's recollection of his June 2002 meeting with Sinins. (*See id.* Ex. B (Cantrell Dep. 43:13-21) ("[T]here was a discussion of the other trade names, all the names that were associated with the offices as trade names used for marketing and local representation, but that all payrolls and all employees w[ere] run through Omne Staffing, Inc.").)

The discrepancy between the employee payroll information provided by Sinins and the April 2003 audit triggered a premium fraud investigation by AMPICO. (*Id.* Ex. H (Smith Dep. 11:1-4).) As part of that investigation, AMPICO's investigator met with Sinins and Galdi. According to Defendant, both Sinins and Galdi again represented that Omne Staffing was the only operating entity. (*Id.* (79:2-6).) Nevertheless, AMPICO's investigation revealed that Omne was conducting business under subsidiaries and had failed to provide AMPICO with notice of most workers' compensation claims. Rather, notice usually came from either claimants' attorneys or a state insurance department. (*Id.* (27:9-28:4).) According to Defendant, the motivation for Sinins's alleged concealment of claims -- what Defendant calls "self-adjusting" -- was to reduce Omne Staffing's premiums. (Def's. S.J. Br. at 4, 10.)

In addition, in and around August 2003, the United States Department of Justice also began and investigation of Omne for premium fraud. (Kaller Decl. Ex. G ¶ 11.) *See also MV Trans.*, 378 F. Supp. 2d at 1203. As a result of that investigation, on or about March 9, 2004, the Federal Bureau of Investigation executed warrants and seized approximately $2.8 million in cash, forcing Omne to suspend all business operations, and eventually leading to Chapter 11 bankruptcy on April 9, 2004. (Kaller Decl. Ex. G ¶¶ 12-13; Amend. Compl. ¶ 3.) With no viable business to reorganize, Omne's

bankruptcy was eventually converted to a Chapter 7 liquidation pursuant to 11 U.S.C. § 1112. (*See* Kaller Decl. Ex. G. ¶ 18.)

On May 6, 2004, Plaintiff Charles M. Forman was appointed as trustee for the Omne estate. (Amend. Compl. ¶ 4.) In connection with his responsibilities as trustee, Plaintiff thereafter began marshaling potential assets for the estate. For example, on January 31, 2005, Plaintiff filed an adversary proceeding against Sinins and his family members. In that adversary proceeding, Plaintiff alleged, among other things, that Sinins "perpetrated a fraud on the Debtors', their customers, their employees and others . . . and conducted the Debtors' affairs in a manner that caused a pre-petition seizure of assets, caused the Debtors' insolvency, caused the Debtors' bankruptcy filings, and exposed the Debtors to significant civil liabilities and potential criminal liabilities as well." (Kaller Decl. Ex. S ¶¶ 1-2.) Plaintiff also brought this action on April 6, 2006, which he suggests is "the largest asset left to be monetized in the bankruptcy estate." (ECF No. 157 Ex. 2 ¶ 25.)

Plaintiff's suit is precipitated on the theory that Wachovia's alleged professional malpractice exposed the Omne estate to two related forms of damages: (1) claims brought by two injured Omne employees not covered under the AMPICO workers' compensation policy; and (2) attorneys' fees generated by workers' compensation claims not covered as a result of Wachovia's alleged negligence. However, Plaintiff did not obtain an expert for liability or file an affidavit of merit in accordance with N.J.S.A. 2A:53A-27, which Defendant argues bars Plaintiff's suit.

The two alleged Omne employees injured are Timothy Hood and Timothy Hoffman. Hood was purportedly "leased" from Omne Leasing to Williams Marine. Hood injured his left foot on a

barge on October 9, 2002 in Naples Florida. (Kaller Decl. Ex. K.)[3] As a result of his injuries, Hood underwent several operations and eventually a foot amputation. (Def's. Br. at 15.) On October 29, 2004, after previously filing an action in Florida state court, Hood filed a proof of claim in the bankruptcy court for $2,000,000. (Kaller Decl. Ex. K.) The other Omne employee, Hoffman, was purportedly "leased" from Omne Leasing to C & D Dockworks. On January 13, 2003, Hoffman dove off a pier during the work day following a bet made with his supervisor. As a result, Hoffman fractured his neck and is now a quadriplegic. (Kaller Decl. Ex. M.) On May 17, 2005, Hoffman filed a proof of claim estimated to be $15,000,000, which was subsequently amended to $23,000,000 on February 25, 2008. (*Id.* Exs. M, N.) According to Hoffman, he has also filed suit against C & D Dockworks and its insurance company in Florida, securing a substantial settlement.

On or about July 6, 2010, Hood and Hoffman agreed to seek direct compensation from Wachovia through their personal attorneys. (*Id.* Ex. 3.) According to the settlement agreement, Wachovia will pay Hood and Hoffman $163,750 and $736,250, respectively, in exchange for the withdrawal of their claims against the Omne bankruptcy estate. (*Id.*) In offering this settlement, Wachovia theorizes that the majority of damages to Plaintiff caused by Wachovia's alleged negligence will be mooted because the bankruptcy estate will no longer be exposed to Hood's and Hoffman's claims. On September 8, 2010, over Plaintiff's objection, the Court entered an order permitting the withdrawal of Hoffman's claim. Hood's claim was withdrawn without objection. The only remaining claim is the Trustee's claim for legal fees incurred. Despite the limited relief remaining, the Trustee must prove liability.

---

[3] The facts regarding Hood's and Hoffman's injuries do not appear in dispute for purpose of the present motions.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotations omitted). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations. *Anderson*, 477 U.S. at 248. "[U]nsupported allegations" are insufficient to defeat summary judgment. *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor -- that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

### III. DISCUSSION

Defendant seeks dismissal of Plaintiff's two count complaint pursuant to the Affidavit of Merit Statute, N.J.S.A. 2A:53A-27. The Affidavit of Merit Statute states in pertinent part:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

The Affidavit of Merit Statute "was enacted as part of a tort reform package designed to "strike [ ] a fair balance between preserving a person's right to sue and controlling nuisance suits." *Palanque v. Lambert-Woolley*, 168 N.J. 398, 404 (2001) (internal quotations omitted; alteration in original). "In professional malpractice actions plaintiffs are required to provide an affidavit from an appropriate licensed professional attesting to the merit of plaintiffs' claims." *Id.* The intent of the statute is to "curtail frivolous litigation without preventing access to the courts for meritorious claims." *Id.* (internal quotations omitted). Thus, a "failure to comply with the statute, either strictly or substantially, will result in dismissal with prejudice, unless an exception applies." *Boerger v. Commerce Ins. Servs.*, No. Civ.A. 04-1337, 2005 WL 2901903, at *2 (D.N.J. Nov. 1, 2005) (internal quotations omitted).

To determine whether the Affidavit of Merit Statute applies, a court must consider three

elements: "(1) whether the action is for damages for personal injuries, wrongful death or property damage (nature of injury); (2) whether the action is for malpractice or negligence (cause of action); and (3) whether the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [ ] fell outside acceptable professional or occupational standards or treatment practices (standard of care)." *N.H. Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 308 (D.N.J. 2010) (quoting *Couri v. Gardner*, 173 N.J. 328, 334 (2002)) (alteration in original; internal quotations omitted).

However, even where these three elements are satisfied, courts do not require an affidavit of merit in so-called "common knowledge" cases. *See Hubbard v. Reed*, 168 N.J. 387, 395-96 (2001). The common knowledge doctrine applies where a "'jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of specialized knowledge of experts.'" *Id.* at 394 (quoting *Estate of Chin v. St. Barnabas Med. Ctr.*, 160 N.J. 454, 469 (1999)). A classic example of a common knowledge case is where a dentist pulls the wrong tooth. *See, e.g., id.* at 396. The New Jersey Supreme Court has made clear though, that the common knowledge doctrine is to be construed narrowly. *Id.* at 397. Thus, in the insurance coverage context, the common knowledge doctrine is limited to "obvious" cases of negligence. *Carolina Cas. Ins. Co. v. Cryan's Ale House & Grill*, Civil Action No. 08-2100 (MLC), 2009 WL 497558, at *6 (D.N.J. Feb. 26, 2009); *compare id.* (preparation of proposal form "beyond common knowledge of lay persons") *with Boerger*, 2005 WL 2901903, at *3 (D.N.J. Nov. 1, 2005) (failure to obtain correct dollar amount of coverage did not require assessment of professional's care, skill or knowledge) *and Bates v. Gambino*, 72 N.J. 219, 226 (1977) (per se negligence established where broker lacked knowledge required by law).

As a preliminary matter, it is undisputed that this is a professional negligence action. (Amend. Compl. ¶ 1.) Directly at issue is "whether the care, skill or knowledge exercised" by Cantrell "fell outside acceptable professional or occupational standards." *Diller*, 678 F. Supp. 2d at 308.[4] Thus, the requirements of N.J.S.A. 2A:53A-27 have been satisfied. The only question is whether the common knowledge doctrine negates Plaintiff's requirement to obtain an affidavit of merit.

Based on the complex and contradictory set of circumstances set forth by the parties, the common knowledge doctrine is inapplicable. Plaintiff's precise theory of liability rests on Cantrell's duty to thoroughly investigate Omne's prior coverage and truthfully and accurately complete the Accord Insurance Application. Plaintiff alleges that Wachovia breached this duty by failing to include other Omne-related entities as named insureds on the AMPICO policy. In making these findings, a jury would have to reconcile, among other things, the source documents Cantrell received and forwarded to Kemper -- past insurance policies, Web site information, company newsletters, historical loss runs, a prior audit report, regulatory files, and financial statements -- with the testimony of Cantrell, and the prior statements made by Sinins.[5] None of this information provides a straightforward or obvious answer as to whether Cantrell was negligent. (*See, e.g.,* Lowenthal

---

[4] Plaintiff argued at the motion to dismiss stage that the nature of his injuries -- money damages -- made the Affidavit of Merit Statute inapplicable because the statute only speaks to "personal injuries, wrongful death or property damage." N.J.S.A. 2A:53A-27. However, the Court rejected Plaintiff's plain language argument, and Plaintiff has not raised it again on summary judgment. (*See* ECF No. 41 (8:17-9-4).)

[5] It is unnecessary for the Court to decide whether the Sinins Declaration should be admitted into evidence for purposes of this summary judgment motion. Even if the Court were to strike the Sinins Declaration at this point, there still exists substantial discrepancies in the evidence, which require an expert.

Decl. Ex. 22 (listing "OMNE STAFFING, INC. ET AL" as the insured).) *See generally Hubbard*, 168 N.J. at 397 (holding that common knowledge doctrine is narrowly construed). Only an expert with specialized knowledge could opine as to whether Cantrell's actions violated his duty.

This case is analogous to *Diller*, a recent District of New Jersey case published subsequent to the parties' briefing on summary judgment. In *Diller*, an insured filed a third-party complaint against his broker for negligence when the plaintiff's insurance company sought to disclaim coverage. 678 F. Supp. 2d at 294-95. At issue was whether the broker failed to accurately prepare the insurance application based on, among other things, the insured's previous "loss history." *Id.* at 293. The court held that, because completion of the insurance application implicated professional responsibilities and judgment, the common knowledge exception did not apply. *Id.* at 310. Errors in preparing the application, the court added, "differ from situations where the defendant's negligence is obvious, such as a doctor pulling out the wrong tooth, a doctor misreading a laboratory report, or a pharmacist filing a prescription with the wrong medication." *Id.* at 311 (internal quotations omitted). Plaintiff's case against Wachovia is no different. As noted, one of the chief components of Cantrell's alleged negligence is his failure to truthfully and accurately complete the Accord Insurance Application. (Lowenthal Decl. Exs. 7, 25.) Thus, the common knowledge doctrine is inapplicable.

Finally, Plaintiff argues that the Court previously ruled in his favor on the Affidavit of Merit argument at the motion to dismiss stage, and therefore the issue is not subject to reconsideration.[6] However, as evident from the transcript of the prior proceedings, the Court's ruling was not that

---

[6] The Honorable Stanley R. Chesler, U.S.D.J. presided over Defendant's motion to dismiss.

definitive. Rather, the Court specifically stated that the issue should be "fleshed out on a summary judgment" and "consider[ed] . . . on a full record." (ECF No. 41 (25:7-13).) Although most cases implicating the Affidavit of Merit Statute can be decided on a motion to dismiss,[7] the Court was wary in this case of making a dispositive ruling based only on the threadbare allegations in the complaint, and when further discovery would no doubt reveal additional complexities. (*See* ECF No. 41 (23:14-21).) Indeed, if a court was always required to decide the Affidavit of Merit issue on a motion to dismiss, it would encourage artful pleading, portraying complicated matters as straightforward common knowledge cases. Thus, the Court's previous ruling on Defendant's motion to dismiss did not preclude Defendant from moving for dismissal on summary judgment pursuant to the Affidavit of Merit Statute. Accordingly, Defendant's motion for summary judgment is granted, and Plaintiff's complaint is dismissed. All other motions are denied as moot.

_____
PETER G. SHERIDAN, U.S.D.J.

September 13, 2010

---

[7] *See generally* Hubbard, 168 N.J. at 394.